\*\*Original filed 6/14/06\*\*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN NGOC HUYNH | ) | No. C 05-0899 JF (PR) |
| Petitioner, | ) ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | ) ) | |
| DAVID L. RUNNELS, Warden, | ) ) | |
| Respondent. | ) ) | |

## I. INTRODUCTION

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for three counts of first degree robbery (Cal. Penal Code § 213(a)(1)(A)) and three counts of false imprisonment (Cal. Penal Code §§ 236, 237) with the use of a firearm (Cal. Penal Code § 12022.53(b), (c), (e)(1)).  On July 2, 2002, Petitioner was sentenced to twenty-six years-to-life consecutive to twenty years in state prison. Petitioner appealed his conviction.  On December 15, 2003, the state appellate court affirmed the conviction on direct appeal.  The state supreme court denied a petition for review on March 3, 2004.  Proceeding pro se, Petitioner filed the instant federal habeas petition on March 3, 2005.

\\\

Petitioner raises the following claims for relief: (1) Petitioner's constitutional right to a fair trial and right to due process were violated by the trial court's refusal to give a requested jury instruction; and (2) Petitioner was denied his federal constitutional right to compulsory and due process, effective counsel and ancillary services in the preparation of his defense by the trial court's denial of his request for appointment of an investigator and a gang expert at public expense.

This Court ordered Respondent to show cause why the petition should not be granted. Respondent filed an answer addressing the merits of the petition. Petitioner did not file a traverse. After reviewing the papers and the relevant portions of the record, the Court concludes that Petitioner's claims are without merit and will deny the petition.

## II. FACTUAL BACKGROUND

The California Court of Appeal found the facts to be as follows:

> Thao Thi Truong had been staying at a house on Dearwell Way in San Jose with her then boyfriend Tien Van Le for two nights prior to October 19, 2000. Late that night, there were nine persons in the house, including Lamyai Sae Eiw. Truong and Le were eating and watching television in the living room with three others when they heard somebody knock on the door. Le went to answer it, and a man put a gun to his head. The man covered part of his face with a cloth, and two other men came in with their faces covered. The taller of the two other men also had a gun. They yelled for everybody to sit down with their hands over their heads. Two men that had been in the house ran outside through the garage. The taller man who had come inside with a gun ran upstairs, threw down a suitcase, and yelled for its owner to unlock it. He also yelled, "Where's the money? If I can't find the money, then somebody is going to get shot."
>
> Tan Van Nguyen and a women came from upstairs to the living room. The second robber told everybody in the living room to put their money on the table. Everybody took out everything they had and put it on the floor or on the table. Truong gave up her earrings and two cell phones. Le gave up $60 and his watch. Eiw gave up a necklace and a watch. Nguyen gave up some money and keys. The third robber got a rice bag from the kitchen, gathered everything from the floor and table, and put it in the bag. The robber from upstairs came down yelling, "We're busted." All three of them then ran toward the kitchen. Truong and Eiw heard a gunshot and everybody in the house, including Nguyen, ran out the front door while the robbers ran out the back. One police officer was already out in front and others arrived later.
>
> Officer Toshi Hata responded to the Dearwell Way area shortly after midnight, and was posted at an intersection about a block and a half away, near a park. Near 1:00 a.m., he observed Petitioner walking toward a house. Hata made contact with Petitioner and noticed that he was carrying a black jacket and was sweating heavily, disheveled, and had grass stains on his pants. Petitioner said that he did not know anybody in the house but was going there to borrow a telephone.

Hata searched Petitioner for weapons, found none, and placed Petitioner in his police car. Truong was brought to Hata's location and identified Petitioner as being one of the robbers. Gunshot residue was later found on the right cuff of Petitioner's jacket.

On October 20, 2000, the police contacted John T. at his school about the robbery. John told officer Paul Joseph that Petitioner, Jimmy Cun, and Trung Vinh Tran were involved with him in the robbery. At John's direction, Joseph drove John to Tran's apartment, where there was a white Mitsubishi parked outside. Tran was arrested shortly thereafter outside his apartment. Tran told Joseph that he had been involved in the robbery. He said that he was familiar with the people who lived at the house, and believed that illegal gambling went on there so that there would be a lot of money. He drove to the house in his white Mitsubishi. He received a call on his cell phone and then waited in his car. Sometime later he heard a gunshot and drove away. He received another call on his cell phone, stopped in the area of Highway 101 and Bernal, and then drove back to his apartment.

Cun was arrested the evening of October 20, 2000, after he left Nguyen's residence. He admitted to Sergeant David Hober that he had been involved in the robbery on Dearwell Way. He said that he went to the house in a white Mitsubishi. He ran into the house with a gun and said, "Where's the money?" He went upstairs where he found a man in the bathroom. He told the man to go sit with the others in the living room. After the victims' belongings were put in a rice bag, he ran to a back sliding glass door. A shot was fired and the door broke open. He ran out and jumped two fences. The gun dropped out of his waistband and he threw his mask away. He called somebody on one of the victims' cell phone, and a white Mitsubishi picked him up in the area of Highway 85 and Bernal Road. Cun said that he got the scratches on his forehead and his hand while running from the scene.

On November 3, 2000, Nguyen admitted to Sergeant Hober that he was at the Dearwell Way address on October 19. He said that he had borrowed Le's cell phone and made a telephone call approximately one-half hour before the robbery occurred. Nguyen was arrested after the interview.

At trial, John admitted being a member of Asian Gangsters for two years prior to October 19, 2000. On that date, he was seventeen years old and was involved in the home invasion robbery on Dearwell Way with defendants. Petitioner and Cun are also members of Asian Gangsters. John thought that Nguyen had been a member but that he "got out" before the robbery. Tran was not a member. John testified that there were about six members in the gang but there was no formal structure to the gang and no specific leaders.

On that evening, John went to Tran's apartment with defendants. There they devised a plan to rob the Dearwell Way house. John understood that the house was a place for prostitution and gambling. Nguyen was supposed to go into the house, call Tran on his cell phone, and tell the rest of them how many people were inside. Tran was to drive Petitioner, Cun and John to the house and back afterwards. Petitioner was to run into the house and Cun and John were to follow him. They were to bring everybody in the house to the living room.

Nguyen drove his car to the house. About ten or twenty minutes later, Tran drove a white Mitsubishi to the house with the others. John found out from

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.jf\hc.05\Huynh899den       3

Petitioner and Cun while in the car that they were going to use guns. Tran received a call on his cell phone. He asked how many people were in the house and then told the others in the car how many people were there. Tran stayed in the car when Petitioner went to knock on the front door and Cun and John went to hide behind a bush. Cun and John put on ski masks. When a man answered Petitioner's knock, Petitioner kicked the door and rushed in. Petitioner covered his face with a rag and pointed a gun at the man. Cun and John rushed in after Petitioner. John and Petitioner ran to the living room and Cun ran upstairs.

Cun brought Nguyen and a woman back downstairs to the living room. Cun and Petitioner told everybody at gunpoint to stay where they were. Nguyen was treated as a victim. Cun went upstairs to search for items, and John went into the kitchen to grab a bag. He took a rice bag back to the living room. Petitioner told the victims to put all their jewelry and money on the table. John picked up the jewelry and cash and put it all in the bag.

Cun and Petitioner yelled, "Let's go." They tried to leave through the back sliding glass door but it would not open. Petitioner fired his gun, shattering the glass. Cun, Petitioner, and John ran from the house through the door. They jumped over the fence, went through another yard, and then jumped over a freeway wall. John and Cun threw away the ski masks and Cun threw away the bag of property they had taken. John lost sight of Petitioner and did not see him again that night. John and Cun ran along the freeway to an exit. Cun used a cell phone taken from one of the victims and called Tran. Tran picked them up and took them home.

On October 19, 2000, the Dearwell Way residence had three couches, a table, and a television set in the living room. There were mattresses on the floor and a dining room table near the back sliding glass door. There were mattresses on the floor or a bed and clothes hanging in the closets in the three bedrooms. A washer, dryer, and laundry detergent boxes were in the laundry room. Officers also found suitcases, laundry baskets, and purses. A .380 spent casing was found on the rug next to an overturned chair near the back door. A ski mask and a gun were found outside the house. An unspent 9 millimeter round was found in the gun. DNA from saliva on the ski mask matched Cun's DNA.

Sergeant Hober testified on behalf of Nguyen that he went to the Dearwell Way address the afternoon of November 2, 2000. Le was there along with four Asian females, one of whom was sitting on a couch in a towel. Three of the females had no identification and did not provide any address. INS officers came and took the three females with them. In Hober's opinion, the house was partially used as a house of prostitution and the three women taken away did not live there. The back sliding glass door of the house had not been repaired, and a mattress covered the doorway. Hober saw KY jelly in a bedroom. He searched a car in the garage and found Le's driver's license in it, with an address outside San Jose. In the trunk of the car were approximately 500 condoms and three tubes of KY jelly.

Petitioner testified in his own behalf that he knew that the Dearwell Way house was a "whorehouse" because he had been there before. On October 19, 2000, he was dropped off by a friend and was walking toward the house when he saw a police car and heard a shot. He then took off running and ended up in a park. He hid in some bushes, but later left to find a phone to call for a ride home. An officer stopped him as he was walking up to another house. Private investigator Kelly Whitney testified on behalf of Petitioner that she photographed the Dearwell Way house on December 19, 2001. At the time, the house appeared

uninhabited and the back sliding glass door was still broken.

### *Gang Evidence*

The parties stipulated that Nguyen is a member of Asian Gangsters. San Jose Police Officer Jason Ta testified as an expert that Asian Gangsters and Kings of the Night are two of several Vietnamese gangs in the San Jose area. Vietnamese gangs are primarily involved in armed assaults on rival gang members. Asian Gangsters, which has about 20 members, are also involved in robberies. In Ta's opinion, the home invasion robbery on October 19, 2000, was committed for the benefit of and in association with Asian Gangsters.

On May 21, 1999, at approximately 8:00 p.m., Officer Juan Ceballos received a report of a gun in a car at Oak Hill Cemetery. The individuals involved were visiting the grave of a recently deceased Asian Gangster. Ceballos field identified Petitioner and Cun at the scene. At the time, Cun acknowledged membership in Asian Gangsters but Petitioner did not.

Petitioner was severely stabbed several times at the Café Quyen on January 14, 2000, after which Tran and two others took Petitioner to the hospital for medical treatment. Police determined that several members of the Kings of the Night were involved in the stabbing. Kings of the Night and Asian Gangsters are rival gangs.

On May 4, 2000, John and Duy N., another member of Asian Gangsters, got into a fight with Vincent H. John had a sword with him that he intended to use, but did not. During the fight Vincent was slashed on the back with Duy's sword. Although Vincent was not in a gang, John admitted that he and Duy were involved in other fights that involved other Vietnamese gangs.

Respondent's Exhibit F (Unpublished Opinion of the California Court of Appeal, Sixth Appellate District, People v. John Ngoc Huynh, et al., H024801, Dec. 15, 2003) at 2-8.

## III. DISCUSSION

**A.    Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings. Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

For purposes of 28 U.S.C. § 2254(d)(1), "clearly established federal law" refers to the holdings of the United States Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). In other words, it is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 123 S. Ct. 1166, 1172 (2003).

A state court decision may be "contrary to" clearly established federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-413.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer, 123 S. Ct. at 1175.

Under 28 U.S.C. § 2254(d)(2), a federal court may grant the habeas writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). The Court must presume correct any determination of a factual issue made by a state court unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.     Petitioner's Claims**

**1. Failure to Give Defense Requested Jury Instruction on Inhabited Dwelling House**

Petitioner contends that the trial court erroneously instructed the jury on the definition of an inhabited dwelling house in violation of his right to due process and a fair trial. Petitioner requested a jury instruction that defined "inhabited dwelling house" as one in which the occupant currently uses the dwelling as sleeping quarters with the intent to do so in the future. The trial court refused to give this instruction.

1    A challenge to a jury instruction solely as an error under state law does not state a
2 claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S.
3 62, 71-72 (1991).  See, e.g., Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state
4 law determination that arsenic trioxide is a poison as a matter of law, not element of crime
5 for jury determination, not open to challenge on federal habeas review); Walker v. Endell,
6 850 F.2d 470, 475-76 (9th Cir. 1987) (failure to define recklessness at most error of state
7 law where recklessness relevant to negate duress defense and government not required to
8 bear burden of proof of duress), cert. denied, 488 U.S. 926 (1988).  Nor does the fact that
9 a jury instruction was inadequate by federal direct appeal standards
10 mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus
11 relief from a state court conviction.  See Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir.
12 1995) (citing Estelle, 502 U.S. at 71-72), cert. denied, 517 U.S. 1158 (1996).
13    To obtain federal collateral relief for errors in the jury charge, a petitioner must
14 show that the ailing instruction by itself so infected the entire trial that the resulting
15 conviction violates due process.  See Estelle v. McGuire, 502 U.S. at 72; Cupp v.
16 Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637,
17 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,
18 erroneous or even "universally condemned," but that it violated some [constitutional
19 right].).  The instruction may not be judged in artificial isolation, but must be considered
20 in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at
21 72.  In other words, the court must evaluate jury instructions in the context of the overall
22 charge to the jury as a component of the entire trial process.  United States v. Frady, 456
23 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v.
24 California, 843 F.2d 314, 317 (9th Cir.), cert. denied, 488 U.S. 861 (1988); see e.g.,
25 Middleton v. McNeil, 541 U.S. 433, 438 (2004) (per curiam) (no reasonable likelihood
26 that jury misled by single contrary instruction on imperfect self-defense defining
27 "imminent peril" where three other instructions correctly stated the law).
28    Here, the trial court instructed the jury on the definition of robbery, and that every

robbery of a person in an inhabited dwelling was first degree robbery.[1]  At the request of the prosecutor, the trial court then instructed, "'Inhabited dwelling house' means [¶] A structure where people ordinarily live and; [¶] Which is currently being used for dwelling purposes. [¶] An inhabited dwelling house need not be the victim's regular or primary living quarters," pursuant to People v. Fond, 71 Cal.App.4th 127, 130 (1990).[2]  Ex. F at 8. The trial court refused a requested defense instruction that "[i]nhabited dwelling house means – a place is an inhabited dwelling if a person with possessory rights uses the place as sleeping quarters, intending to continue to do so in the future." Ex. F at 8.

Petitioner fails to show that the trial court erred in refusing his requested instruction. The instruction given by the trial court defined "inhabited dwelling house" in a manner consistent with California law. Fond, 71 Cal.App.4th at 130. Moreover, as the state appellate court observed, Petitioner's requested instruction was a misstatement of California law:

> In *People v. Hughes* (2002) 27 Cal.4th 287, the defendant argued that there was insufficient evidence that the victim's apartment was an "inhabited dwelling" for purposes of both first degree robbery and first degree burglary because the victim was in the process of moving her possessions to her boyfriend's home and had slept there during the prior two weeks. (Id. at p. 354.) In rejecting this argument our Supreme Court stated, "The use of a house as sleeping quarters is not determinative, but instead is merely a circumstance used to determine whether a house is inhabited." (*Ibid*.; citing *Hernandez*, *supra*, 9 Cal.App.4th at pp. 440-442.)
>
> The instruction given in this case properly defined "inhabited dwelling house" as a "structure where people ordinarily live and...which is currently being used for dwelling purposes" (*Fond*, *supra*, 71 Cal.App.4th at p. 130.) *Defendants' requested instruction would have grafted a "use as sleeping quarters" requirement onto the definition of "inhabited dwelling house" for purposes of first*

---

[1] CALJIC No. 9.42 (In pertinent part: "There are two degrees of robbery. Every robbery of any person which is perpetrated in a[n] inhabited dwelling house or the inhabited portion of any other building is robbery of the first degree. All other robberies are of the second degree. If you find the defendant[s] guilty of robbery, you must determine the degree thereof, and state that degree in your verdict. If you have a reasonable doubt whether the robbery is of the first or second degree, you must find it to be of the second degree.")

[2] As Respondent notes, this instruction closely parallels CALJIC No. 14.52, the standard instruction relating to the definition of an inhabited dwelling house for the purposes of burglary: "An inhabited dwelling house is a structure which is currently used as a dwelling whether occupied or not. It is inhabited although the occupants are temporarily absent." Resp. Mem. at 8.

    *degree robbery. There is no such requirement*, although defendants were free to argue that it was a circumstance that the jury could consider.

Ex. F at 10 [Emphasis added].

    Petitioner thus fails show any error in the trial court's instruction of the jury, let alone an error that so infected the trial as to make it fundamentally unfair. Accordingly, the state appellate court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority, nor was it based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2).

### 2. Denial of Defense Request for an Investigator and Gang Expert

    Petitioner also contends that the trial court's denial of his request for appointment of an investigator and a gang expert violated his federal constitutional rights to compulsory and due process, effective assistance of counsel and ancillary services in the preparation of his defense.

    As Respondent points out, there is no clearly-established United States Supreme Court authority determining the right of indigent defendants to investigative and other ancillary services. In fact, the Supreme Court expressly has declined to decide that question. See Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1 (1985).[3] By definition, the rejection of Petitioner's claim by the California courts was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority. See 28 U.S.C. § 2254(d)(1); see also Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004) (affirming denial of a habeas petition claiming that the petitioner's trial in one county for a crime he committed in another county violated the Vicinage Clause of the Sixth Amendment because the Supreme Court has yet to decide whether the Vicinage Clause applies to the

---

    [3]In Caldwell, the United States Supreme Court held that the trial court's refusal to appoint various experts to assist the defendant did not deprive him of his constitutional rights because the defendant offered the trial court no more than "undeveloped assertions" that the requested assistance would be beneficial. Caldwell, 472 U.S. 320, 323 n. 1. The Court concluded: "We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought." Id.

states through the Fourteenth Amendment).

Moreover, Petitioner fails to show that the state appellate court's decision was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(2). After an in camera hearing with defense counsel, the trial court determined that counsel had not made the required showing that the requested services were "reasonably necessary" for Petitioner's defense. The California Court of Appeal affirmed that decision as follows:

> An indigent defendant is entitled not only to the appointment of trial counsel but also to funds for any ancillary services that are reasonably necessary to insure presentation of a defense. (*Ake v. Oklahoma* (1985) 470 U.S. 68, 76-77: *People v. Mattson* (1990) 50 Cal.3d 826, 847-848; *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319 (*Corenevsky*).) The defendant must demonstrate "the need for such services by reference to the '"general lines of inquiry he wishes to pursue, being as specific as possible"'" and his request will be granted only if he establishes that the services are reasonably necessary. (*Corenevsky*, *supra*, 36 Cal.3d at p. 329.) "An appellate court reviews a trial court's ruling on an application for authorization to incur expenses to prepare or present a defense for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 234.) "An order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Corenevsky*, *supra*, 36 Cal.3d at p. 321.)
> Based on our review of the record, we find no abuse of discretion. Because the evidence showed that Petitioner was the sole person who discharged a gun that night, the trial court granted his request for a gunshot residue expert to challenge specific evidence. However, there were four codefendants in this case and the remainder of the evidence as to each defendant's participation in the home invasion robbery was similar. At least one codefendant was represented by appointed counsel, and at least one codefendant had retained counsel. Retained counsel had retained an investigator, yet [Petitioner] did not show the trial court that that investigator's work was not sufficient for [Petitioner]'s needs. No codefendant was requesting funds to hire a gang expert, and there is no support for [Petitioner]'s implicit claim that a defense attorney in every case must be able to present expert testimony to challenge a prosecution's gang expert testimony. As counsel was not able to articulate what her proposed investigator and expert witness would discover or say that could not be presented at trial through cross-examination of other witnesses, no abuse of discretion is shown.

Ex. F at 12-13.

Having reviewed the record, this Court concludes that the trial court's findings, and the appellate court's affirmation of these findings, were not unreasonable in light of the evidence presented. Nor has Petitioner shown that any alleged error was prejudicial; i.e. that the claimed error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (actual

prejudice standard for trial error in habeas cases).  With respect to the funds requested for an investigator, the appellate court noted that a private investigator was retained by Petitioner's trial counsel and testified on Petitioner's behalf at his April 2002 trial.  Ex. F at 11.

As to the requested gang expert, evidence of Petitioner's gang association was substantial: Petitioner had been identified by other admitted gang members as taking part in the October 19, 2000 robbery, he had been identified by police as associated with the Asian Gangsters because of his presence at the funeral of another Asian Gangster, and he recently had been stabbed by members of a rival gang.  As the appellate court noted, there is no support for Petitioner's claim that the defense must be able to present expert testimony to challenge the prosecution's gang expert testimony.  Ex. F at 12-13.

Accordingly, this Court concludes that the state appellate court's decision was not contrary to, nor an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1), (2).

## IV. CONCLUSION

The Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for writ of habeas corpus is denied.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 6/13/06

JEREMY FOGEL
United States District Judge

11

1   A copy of this ruling was mailed to the following:

2

3   John Ngoc Huynh
    T-59834
4   High Desert State Prison
    P.O. Box 3030
5   Susanville, CA  96127-3030

6

7   Aileen Bunney
    California State Attorney General's Office
    455 Golden Gate Avenue
8   Suite 11000
    San Francisco, CA  94102-7004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28